

**ORDERED in the Southern District of Florida on September 3, 2020.**

_Mindy A. Mora_
**Mindy A. Mora, Judge**
**United States Bankruptcy Court**

_____

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| In re: | Case No. 13-21648-MAM |
| MOHAMMAD M. ZAMAN and NASRIN M KAHN | Chapter 11 |
| Debtor(s). | |
| _____ / | |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR LEAVE (ECF NO. 370)

Inadequate service and conflicting testimonial evidence feature prominently in this case. The creditor alleges absence of notice. The debtor asserts implicit notice through a cast of interrelated characters. Caught between two conflicting (but plausible) versions of the truth presented years after the fact, the Court must accept the story as it was told through admissible evidence, not the story as it was perceived by those involved. As a result, the Court grants in part and denies in part the relief sought in the *Motion for Leave to Proceed with Action Against Debtors Based on Post-*

*Petition Dealer Supply Agreement, Lease Agreement and Guarantees of Debtors* (ECF No. 370) (the "Motion").

## BACKGROUND AND PROCEDURAL HISTORY

On May 11, 2019, creditors Power Petroleum Inc. ("PPI") and M & A Brothers Realty No. 3 ("M & A" and collectively with PPI, "Creditors") filed the Motion. Creditors' request for relief came on the heels of an unrelated request by Wells Fargo Bank, N.A. ("Wells Fargo") to reopen Mohammad M. Zaman and Nasrin M. Khan's ("Debtors") bankruptcy case ("Bankruptcy Case"), which had been administratively closed for a little over fifteen months pending substantial consummation of a confirmed chapter 11 plan. Although Debtors were able to come to an agreement with Wells Fargo that prevented litigation, they were not so fortunate with Creditors.

In filing the Motion, Creditors represented to the Court that (i) Creditors had received inadequate notice of the filing of the Bankruptcy Case, (ii) Debtor Zaman personally guaranteed postpetition agreements for his wholly-owned business entity, Nasrin Oil Corporation ("NOC"), and (iii) Debtor Zaman remained liable for his guarantee of NOC's obligations.

The full facts of what happened, when, where, and how, are far more convoluted than the Court's simple summary of Creditors' claims would suggest. To properly tell the tale, the Court must go back in time, prior to the filing of the Bankruptcy Case.

*The Station and Debtors' Personal Bankruptcy Case*

Debtors Zaman and Khan are husband and wife. Prior to the filing of this

Bankruptcy Case, Debtors operated a gas station and convenience store (the "Station"). The physical location of the Station is unclear from the record, but Debtors' schedules and statements indicate that it provided Debtors' family with its primary source of income for many years.[1]

On May 19, 2013 (the "Petition Date"), Debtors jointly filed this Bankruptcy Case, initially disclosing assets of less than $50,000 and obligations of over $1,000,000.[2] Debtors' schedules reveal that the majority of these obligations related to mortgage debts on two parcels of real property. Debtors ultimately resolved these obligations either through their confirmed chapter 11 plan (the "Plan") or by separate agreement.[3]

Debtors' Bankruptcy Case progressed slowly, taking over three years to arrive at the effective date of the Plan. Although at least some of the delay was likely attributable to causes other than Debtors, the record reflects a case that generally failed to proceed in a timely manner, compared to other similarly situated individual chapter 11 cases. During this time, other entities owned by or otherwise related to Debtors filed their own bankruptcy cases.

### The Related Entities and Business Relationships

Schedule B of Debtors' amended schedules (ECF No. 31) lists ownership

---

[1] *See, e.g.*, ECF No. 24, Schedule I (describing Debtor Zaman as self-employed, and Debtor Kahn as a cashier). The record indicates that Debtors may have owned two stations simultaneously or may have moved from one location to another. For the purposes of this Order, the Court surmises that only one location was operable prepetition.

[2] ECF No. 1.

[3] ECF Nos. 299 and 326.

3

interests in five business entities: NOC, MN Corporation of US ("MNC"), HNA Corporation, Maha and Ali, Inc., and Ambia Corporation.[4] Two of those entities were also debtors before this Court in their own bankruptcy cases. MNC filed for chapter 11 relief in 2015 (the "MNC Case") approximately two years after the date on which Debtors filed their 2013 individual Bankruptcy Case.[5] NOC filed bankruptcy in 2017, roughly two years after MNC filed (the "NOC Case").[6]

The dockets of the MNC and NOC Cases indicate that Debtors operated gas stations at two locations. The first station, located at 5050 Lake Worth Road, Lake Worth, FL 33463 (the "Lake Worth Station"), was operated by MNC.[7] MNC's schedules list a fuel supply agreement (the "FSA") with Crystal Petroleum ("Crystal") for fuel that was sold at the Lake Worth Station. MNC owned the property for the Lake Worth Station in fee simple but granted Crystal a second mortgage, presumably as collateral for obligations arising out of the FSA. Debtor Zaman testified at an evidentiary hearing (the "Hearing") on the Motion that Andrew Hrenick ("Hrenick") owned Crystal.[8]

---

[4] Debtors' schedules disclose that an entity named "Hefaz Enterprises" owned the Station. ECF No. 24, at p. 23 (Question 18). The precise nature of Debtors' relationship with the entity (i.e., director, partner, etc.) is unclear.

[5] Case No. 15-15416 (the "MNC Bankruptcy").

[6] Case No. 17-22086.

[7] Case No. 15-15413, ECF No. 1, p.17 (filed on March 25, 2015); ECF No. 27 at ¶ 5.

[8] The relevance of this testimony will become more apparent as this story unfolds. The FSA is not at issue, but its existence is central to Debtor Zaman's theory of implicit notice to Mike Shehadeh, Creditors' officer.

4

During their 2013 Bankruptcy Case, Debtors, through NOC, began operating a gas station at 3067 Jog Road, Greenacres, FL 33060 (the "Jog Road Station").[9] Exactly one week after MNC filed its bankruptcy petition, NOC entered into a lease (the "Lease") dated as of April 1, 2015 for the Jog Road Station with Coral Petroleum, Inc. ("Coral"). Hrenick, Crystal's owner, was also the president of Coral and executed the Lease for the Jog Road Station in that capacity.[10] Debtor Zaman executed the Lease on behalf of NOC and personally guaranteed NOC's obligations (the "Lease Guarantee").

That same day, April 1, 2015, NOC entered into a dealer supply agreement (the "DSA") with Power Petroleum, Inc. ("PPI") for fuel to be sold at the Jog Road Station. Mike Shehadeh ("Shehadeh"), president of PPI, executed the DSA in that capacity. Debtor Zaman executed the DSA on behalf of NOC and personally guaranteed NOC's obligation under the DSA (the "DSA Guarantee") in favor of PPI, in addition to his guarantee of the Lease with Coral.[11] The docket in the Bankruptcy Case does not reflect that Debtor Zaman sought this Court's approval of either Guarantee.

At this point, a quick recap of the business relationships may prove helpful:

---

[9] Case No. 15-15413, ECF No. 1, at p. 13; ECF No. 370-1, at p. 30-40.

[10] Although the record lacks documentary evidence of this point, Debtor Zaman testified that Hrenick owned both Crystal and Coral. The record of the MNC and NOC bankruptcy cases supports this testimony, as Crystal and Coral shared a mailing address. *Compare* Case No. 15-15416, ECF No. 1, p. 30, *with* Case No. 17-22086, ECF No. 1, p. 12 (Question 4.1).

[11] The DSA and Lease each contain a signature line for a "Personal Guarantor" executed by Debtor Zaman. For convenience, the Court refers to the Lease Guarantee and DSA Guarantee collectively as the "Guarantees".

5

| Entity | Agreement(s) | Counterparty | Representative |
|--------|--------------|--------------|----------------|
| MNC | FSA (and second mortgage) | Crystal | Hrenick |
| NOC | Lease | Coral (then M & A, as described below) | Hrenick (then Shehadeh) |
| NOC | DSA | PPI | Shehadeh |

Approximately three years after the filing of Debtors' Bankruptcy Case and a little over one year after the execution of the DSA and Lease, Coral assigned (the "Assignment") its interest in the Lease to M & A.[12] Hrenick executed the Assignment on June 8, 2016 in his capacity as President of Coral and Shehadeh executed it on June 10, 2016 on behalf of M & A.

A little over a year later, on September 26, 2017, the law firm of Shehadeh Giannamore, PLLC[13], representing PPI, sent a letter to NOC, c/o Debtor Zaman, advising of a default under the DSA. NOC filed for chapter 11 relief seven days later on October 3, 2017. NOC subsequently dismissed its bankruptcy case about six months later (on April 19, 2018) without having successfully confirmed a chapter 11 plan. In December 2018, Creditors filed suit against Debtor Zaman and NOC (the "State Court Case") in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, FL (the "State Court").

---

[12] ECF No. 370-1, at pp. 42-43. Testimonial evidence submitted at the Hearing and pleadings filed in this Bankruptcy Case indicate that "Mahmoud" Shehadeh is the same person as "Mike" Shehadeh, the President of M & A.

[13] The relationship between Shehadeh and the firm of Shehadeh Giannamore PLLC is not apparent from the record.

*Notice of Bankruptcy Cases*

The parties do not dispute that neither PPI nor M & A received actual notice of Debtors' Bankruptcy Case. Debtor Zaman attributes the lack of notice to a lack of any relationship with Creditors as of the Petition Date. Debtor Zaman acknowledges that he did not update the list of creditors in this Bankruptcy Case after NOC's execution of the DSA and Lease despite his status as guarantor under both agreements.[14]

On the other hand, neither party disputes that Creditors received actual notice of the NOC Case. Creditors were highly active in that case, vigorously litigating M & A's entitlement to possession of the Jog Road Station and PPI's entitlement to payment for fuel supplies under the DSA.[15]

In addition, the parties do not dispute that Crystal (and therefore Hrenick, as Crystal's President) had notice of the MNC Case.[16] The docket of the MNC Case shows that MNC disclosed the existence of Debtor Zaman's personal Bankruptcy Case to all parties in interest in the MNC Case on April 24, 2015, which was about three weeks after Debtor Zaman executed the Guarantees of the obligations under the Lease and DSA.[17] The record also reflects that Hrenick, in his capacity as president of Coral (not Crystal) executed the Assignment *after* receiving notice of the

---

[14] As noted previously, *infra*, Debtor Zaman also failed to obtain this Court's approval of the Guarantees.

[15] *See, e.g.,* Case No. 17-22086, ECF Nos. 28 and 54.

[16] Case No. 15-15416, ECF No. 1, at p. 13.

[17] Case No. 15-15416, ECF No. 27, at ¶ 2.

7

MNC Case and therefore notice of this Bankruptcy Case. What the record fails to show, however, is whether Hrenick (president of both Crystal and Coral) disclosed the existence of Debtors' personal Bankruptcy Case to Shehadeh (Creditors' president) as part of routine due diligence prior to the execution of the Assignment.

## CONCLUSIONS OF LAW

### I. Nature of Relief Sought

The Motion seeks several forms of relief, some of which are contradictory. Because the Motion expresses Creditors' desire to proceed with the State Court Case, the Court construes the Motion as a request for stay relief. In light of the Court's ruling herein, the Court declines to address the ancillary requests for "deemed approval" of the DSA and Lease as being in the "ordinary course of business" and for relief from any applicable statutes of limitations to proceed with an adversary proceeding.

### II. Notice

The primary issue in this dispute is one of adequate notice. That is the 800-pound gorilla that neither party addressed in a clear fashion, but which must govern the Court's resolution of the Motion. To make a very complicated issue quite simple, the Court is confronted with the issue of whether, without Debtors having provided Creditors with actual notice of this Bankruptcy Case, Creditors are bound by any documents filed within the case, including Debtors' Plan and the confirmation order (ECF No. 326, the "Confirmation Order"). And the clear answer is no.

Proper notice is fundamental to the successful resolution of any bankruptcy

case. *Westchester Surplus Lines Ins. Co. v. Surfside Resort and Suites, Inc. (In re Surfside Resort and Suites, Inc.)*, 344 B.R. 179, 187 (Bankr. M.D. Fla. 2006). In the context of a chapter 11 case, proper notice is essential to ensure that creditors whose rights and interests may be altered by the reorganization plan have an opportunity to object to confirmation. *Id.* Absent this opportunity, a creditor has a near iron-clad argument that due process has not been observed, and that he should not be bound by the terms of the plan and any attendant court-ordered or statutory injunction. *Id.* (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 US. 308, 314 (1950)).

Debtor Zaman testified credibly that he understood and believed that Creditors had knowledge of the Bankruptcy Case because (i) Crystal and Coral were "the same", meaning Hrenick owned and controlled both entities, (ii) Hrenick had undisputed knowledge of the MNC Case becuase MNC served Crystal with a copy of MNC's chapter 11 case management summary disclosing that Debtor Zaman was a debtor in this Bankruptcy Case,[18] and (iii) Hrenick and Shehadeh were business associates. Debtor Zaman specifically testified that it was his firm belief that Hrenick and Shehadeh have worked together at various points in life and are well-acquainted with one another.

The record clearly reflects that Creditors were active participants in the NOC Case. The record also shows a certain amount of overlap between the cast of characters involved in the various cases, including Hrenick and Shehadeh. Debtor Zaman passionately testified that he only executed the Guarantees because he was

---

[18] Case No. 15-15416, ECF No. 27, at ¶ 2, and ECF No. 28.

9

forced to do so. This is troubling. However, Debtor Zaman also testified that he intentionally failed to disclose his (and Debtor Khan's) personal Bankruptcy Case when he executed the Guarantees because he was afraid of losing his livelihood. This is equally troubling. And, in yet another twist, Debtor Zaman also testified—again credibly—that he was convinced that Shehadeh absolutely knew of the Bankruptcy Case through his (allegedly many) dealings with Hrenick.

Shehadeh disputed Debtor Zaman's allegation that Hrenick had a personal or professional association with Shehadeh. Moreover, Shehadeh claimed categorically that no business relationship ever existed between Coral and M & A other than as assignor and assignee under the Assignment. Shehadeh's contention, in other words, is that Hrenick's knowledge of Debtors' Bankruptcy Case from the disclosure listed in MNC's chapter 11 case management summary could be imputed to Coral (which Hrenick also controlled), but not to Shehadeh or Creditors.[19] And, simply put, therein lies the rub. It was Debtor Zaman's obligation to prove otherwise. Upon the facts presently in the record, the Court finds and determines that Debtor Zaman has failed to meet his burden of proof.

In making this finding, the Court must observe that it specifically declines to opine as to *whether* Shehadeh or Creditors had actual knowledge of this Bankruptcy Case. That fact, unfortunately, is as opaque as the history of the relationships between the parties. What the Court finds and determines is much simpler: Debtor

---

[19] PPI's relationship with NOC was direct via the DSA, but Coral assigned the NOC Lease to M & A via the Assignment.

Zaman did not present sufficient evidence to the Court to demonstrate that Creditors definitively had knowledge of **this** Bankruptcy Case.

As a result, the Court holds that Creditors are not bound by entry of the Confirmation Order and may pursue litigation against Defendant Zaman in the State Court Case. Although the Court grants stay relief to proceed in that action, the Court cautions Creditors that the grant of stay relief in this Order should not be construed as a determination that Debtor Zaman remains liable on the Guarantees under applicable state law. The Court also declines to enforce (or find unenforceable) the terms of either agreement. Those issues are properly before the State Court and should be determined within the State Court Action. What this Court has determined is that the Plan and Confirmation Order do not bar the prospective enforcement of the Guarantees, and that the Plan and Confirmation Order are not binding on Creditors with respect to (a) the injunction set forth in section 7.13 of the Plan, and (b) the executory contract provision set forth in section 6.01 of the Plan.

### III.   Supplemental Theories Presented to the Court

At the conclusion of the Hearing, the Court requested additional briefing from the parties in the form of proposed findings of fact and conclusions of law. Those submissions included discussions of legal theories beyond the realm of notice, including extensive analysis of the *Barton* doctrine. To provide clarity in the record, the Court will briefly address those arguments.

The *Barton* doctrine derives from *Barton v. Barbour*, a United States Supreme Court case from 1881. 104 U.S. 126 (1881). *Barton* held that "before suit is brought

against a receiver[,] leave of the court by which he was appointed must be obtained." *Id.* at 127. Circuit Courts, including the Eleventh Circuit Court of Appeals, have extended operation of the *Barton* doctrine to include suits against a bankruptcy trustee. *Carter v. Rodgers*, 220 F.3d 1249, 1252 (2000).

Because the *Barton* doctrine is a judicially-created (rather than statutory) doctrine, it falls into the territory of federal common law. *Lawrence v. Goldberg*, 573 F.3d 1265, 1269 (11th Cir. 2009). Within the Eleventh Circuit, the *Barton* doctrine applies to actions against officers appointed by the bankruptcy court when those officers are operating within the scope of their court-appointed duties. *Id.* (citing *Carter*, 220 F.3d at 1252). Essentially, the Barton Doctrine acts as a jurisdictional bar to suits against a receiver, trustee, or officer appointed by a court when the claims are asserted in any court other than the appointing court. *McKinney v. 2nd Chance Auto Sales, Inc.*, 611 B.R. 894, 898 (Bankr. M.D. Ala. 2020).

Debtor Zaman contends that the *Barton* doctrine should extend to cover his actions as the debtor in possession of Debtors' bankruptcy estate, including actions taken in furtherance of the Plan.[20] Specifically, Debtor Zaman argues that confirmation of the Plan constituted rejection of the Guarantees. He then stretches this logic to advance his theory that the Barton Doctrine prevents suit upon either agreement.

---

[20] Debtor Zaman suggests that a debtor in possession, standing in the shoes of a chapter 11 trustee under Bankruptcy Code § 1107, is entitled to the benefits of the *Barton* doctrine, but has failed to provide any authority for this proposition.

12

Debtor Zaman's argument is creative but, unfortunately, it is also misguided. The primary obstacle to Debtor Zaman's position is one of status: he is not a "court-appointed" trustee or officer. As debtors in possession, Debtors Zaman and Khan sought and received the protections of this Court under chapter 11 of the Bankruptcy Code. To facilitate the performance of their duties as debtor in possession, Bankruptcy Code § 1107 provided both Debtors with the rights and powers of a trustee. This statutory grant of authority, however, is not to be confused with court appointment pursuant to Bankruptcy Code § 1104, nor should it be conflated with the power and authority attendant to court appointment of an examiner or other officer of the court.

The next obstacle to Debtor Zaman's argument concerns the nature of the obligations arising under the Guarantees. Specifically, his arguments against the validity of the Guarantees hinge upon his ability to the classify them as agreements capable of rejection under the Plan.

This Bankruptcy Case and its related cases (the MNC Case and NOC Case) present a unique factual situation unlikely to be repeated in the near future. Neither the MNC Case nor the NOC Case resulted in a confirmable plan. In both instances, each of the respective debtor entities, acting through Debtor Zaman, voluntarily dismissed its bankruptcy case without reconciling all claims. As a result, the NOC Case did not address the validity and extent of Creditors' claims.[21] This wrinkle

---

[21] Creditors filed proofs of claim nos. 3 and 4 in the NOC Case, but did not file any proofs of claim in the MNC Case.

13

requires the Court to address claims arising from operation of the Jog Road Station in the context of Debtors' individual Bankruptcy Case, which naturally creates a situation for the Court that is a step removed from a typical straight-forward analysis of claims.

Debtor Zaman has argued that section 6.01 of the Plan provides for the rejection of any executory contract not expressly assumed in the Plan or during the Bankruptcy Case. He posits that the Guarantees (which both related to operation of the Jog Road Station by NOC) should be deemed executory contracts in Debtors' individual Bankruptcy Case subject to section 6.01 of Debtors' Plan. However, there are two problems with Debtor Zaman's argument. First, Debtor Zaman has failed to show that Creditors received actual notice in this Bankruptcy Case of his intent to reject the Guarantees. Second, Debtor Zaman has also failed to demonstrate that the Guarantees constituted executory contracts that would be subject to section 6.01 of the Plan.[22]

Just as it stands to reason that a creditor without any notice of a bankruptcy case typically should not be harshly sanctioned for an action taken in violation of the automatic stay, this Court easily concludes that the *Barton* doctrine should not be

---

[22] Two issues come to mind that preclude the application of section 6.01 of the Plan to Debtor Zaman's obligation under the Guarantees. First, it is certainly not clear that a one-sided obligation to pay money under a guarantee fits within the customary definition of an executory contract under either the Countryman test or the functional analysis test. *See Del Franco v. Mamedes (In re Mamedes),* Adv. Proc. No. 19-01355, 2020 WL 4289764, at 3-4 (Bankr. S.D. Fla. 2020). Second, Debtor Zaman executed the Guarantees during his Bankruptcy Case, which transformed the Guarantees into administrative obligations rather than pre-petition obligations that could be assumed or rejected.

stretched to protect a post-confirmation debtor who is seeking to bar suit upon a post-petition agreement allegedly rejected under his Plan.

In this Bankruptcy Case, Debtor Zaman merely served as a debtor in possession. He was not a court-appointed trustee or a court-appointed officer.[23] Setting that complication aside, the Guarantees are post-petition agreements incapable of rejection pursuant to 11 U.S.C. § 365. And, even if they were executory (they weren't), Debtor Zaman still failed to demonstrate that he provided Creditor with notice of the purported rejection of his Guarantees. The *Barton* doctrine is therefore simply inapplicable to the case at hand.

Debtor Zaman also contends that his failure to timely seek this Court's approval under § 363 of the Guarantees now renders the Guarantees unenforceable. This logic is obviously flawed. In a nutshell, Debtor Zaman's theory is that these Guarantees are not obligations normally entered into by a chapter 11 debtor in the ordinary course of business, and that under both the vertical (creditors' expectation) dimension test and the horizontal (comparable business) dimension test, the Guarantees are invalid absent prior Court approval. *See In re Leslie Fay Cos.*, 168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994).

This argument—although innovative—is unsound. Debtor Zaman testified that when he executed the Guarantees, he consciously elected not to flag the existence of this Bankruptcy Case to Creditors at that time. Debtor Zaman now seeks to avoid

---

[23] *See Lawrence v. Goldberg*, 573 F.3d at 1268-70 (identifying attorneys and investigators retained by trustee with bankruptcy court approval as court-appointed officers whose conduct was protected by *Barton* doctrine).

15

those same Guarantees by arguing that his failure to obtain this Court's approval renders them unenforceable. As a court of equity, this Court cannot condone this result.

Having weighed the scant available evidence, and being mindful of its obligation to interpret the story as it exists in the record, not as the parties may have perceived it at the time, the Court determines that Debtor Zaman's failure to either actively notify Creditors of this Bankruptcy Case or seek court approval of the Guarantees at the time of execution estops him from relying upon Bankruptcy Code § 363 today. Debtor Zaman's protestations that the Guarantees fell outside the ordinary course of his business and required this Court's approval fall flat in the face of his decision to incur post-petition obligations while affirmatively electing not to alert the Creditors to the pendency of this Bankruptcy Case. *See Slater v. U.S. Steel Corporation*, 871 F.3d 1174, 1180 (11th Cir. 2017) ("The equitable doctrine of judicial estoppel is intended to 'prevent the perversion of the judicial process' and 'protect [its] integrity . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'") (citation omitted).

In order to receive the benefit of the protections of a plan injunction, Debtor Zaman was required to (i) notify post-petition Creditors of this Bankruptcy Case and (ii) obtain Court approval for any transaction outside of the ordinary course of business. Debtor Zaman cannot ignore these duties and then argue that his failure to perform them renders his obligation to Creditors unenforceable. And, to the extent that Debtor Zaman believes—perhaps correctly—that Creditors knew of the

16

existence of this Bankruptcy Case at the time of signing, the Court concludes that this belief was not clearly proven by the conflicting evidence presented at the Hearing.

## ORDER

Accordingly, the Court, having considered all relevant pleadings, the record of this Bankruptcy Case, the MNC Case, and the NOC Case, and being otherwise fully advised in the premises, **ORDERS AND ADJUDGES** that:

1. The Court **GRANTS** in part and **DENIES** in part the relief sought in the Motion.

2. The Court **GRANTS** Creditors relief from the automatic stay and any injunction set forth in the Plan or Confirmation Order to proceed with litigation of the State Court Case against Debtor Zaman relating to the Guarantees.

3. Entry of the Confirmation Order approving the Plan did not result in the rejection of the Guarantees executed by Debtor Zaman in favor of Creditors under the Lease and the DSA, nor did it result in the discharge of such Guarantees.

4. Debtor Zaman's failure to obtain this Court's approval of the Guarantees does not render the Guarantees unenforceable.[24]

5. The Court **DENIES** the Motion in all other respects.

6. To the extent that the Court has subject matter jurisdiction over any remaining requests for relief set forth in the Motion to resolve issues under applicable state law, the Court **ABSTAINS** from determining such matters.

---

[24] The Court does not opine as to the enforceability of the Guarantees.

17

###

Copies Furnished To:

Victor Rones, Esq.

*Attorney Rones shall immediately serve this Order upon all interested parties and file a certificate of service with the Court that conforms with Local Rule 2002-1(F).*